UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Rachell Logan Abstance, | ) | C/A No. 5:24-687-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn Colvin, Acting Commissioner of | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and
Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff
brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision
of the Commissioner of Social Security ("Commissioner") denying her claim for Disability
Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social
Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the
Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On December 23, 2019,[2] Plaintiff protectively applied for DIB and SSI under Title II and
Title XVI of the Act. Tr. 241-50. She alleged a disability onset date of December 11, 2019. Tr.
241. Plaintiff's applications were denied initially, Tr. 146-47, and upon reconsideration, Tr. 176-

---

[1] Carolyn Colvin became the Acting Commissioner of Social Security on November 30, 2024.
Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn Colvin should be
substituted for Martin O'Malley as the defendant in this case.
[2] Although the Application Summaries are dated January 17, 2020, as noted in the Disability
Determination and Transmittals, Plaintiff's protected filing date is December 23, 2019. Tr. 146-
47.

77, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 202-03. The administrative hearing was held on February 16, 2021, Tr. 30-58, and on March 16, 2021, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 9-24. Plaintiff requested review of the ALJ's decision, Tr. 236-39, and on October 19, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner, Tr. 1-5.

Plaintiff filed an action in the United States District Court for the District of South Carolina seeking judicial review of the Commissioner's decision in a Complaint filed on December 21, 2021. *See* Compl., C/A No. 5:21-cv-4104-KDW, ECF No. 1. Plaintiff obtained an Order, dated February 9, 2023, reversing the Commissioner's decision and remanding the case for further proceedings. Tr. 641-68. Based on the court's order, on March 10, 2023, the Appeals Council vacated the final decision of the Commissioner and remanded the matter for "further proceedings consistent with the order of the court." Tr. 672.

ALJ Garves conducted a second administrative hearing on August 15, 2023. Tr. 620-40. On October 26, 2023, the ALJ issued an unfavorable decision denying Plaintiff's claim. Tr. 590-612. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on February 9, 2024. ECF No. 1.

B.     Plaintiff's Background

Plaintiff was born in December 1975, and just shy of her 44th birthday as of her alleged onset date of December 11, 2019. Tr. 263. In her January 17, 2020 form Disability Report-Adult, Plaintiff indicated that she completed the twelfth grade, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 268. She noted her past relevant work ("PRW") included working as a factory invoice specialist (2004-2008), home cleaning person (2011-2014), and restaurant driver (2019). *Id.* Plaintiff indicated that

2

she stopped working on December 19, 2019, because of her conditions which she listed as sensory polyneuropathy, bulging disk, PDA[3], PTSD, spinal stenosis, cataracts, and migraine headaches. Tr. 267. Plaintiff indicated that she is 5'3" tall, weighed 190 pounds, and her conditions caused her pain or other symptoms. *Id.*

In a Disability Report-Appeal dated July 14, 2020, Plaintiff indicated that her medical condition had changed in May 2020. Tr. 282. She described those changes as "degenerative arthritis on three compartments of my knee." *Id.* Plaintiff indicated a change in her daily activities of having to "struggle with cleaning up around my home due to severe pain." Tr. 286.

In a September 30, 2020 Disability Report-Appeal Plaintiff indicated a change in her medical condition that occurred in March 2020. Plaintiff noted that "the amount of weight that I can bare [sic] in my left leg has gotten worse and my doctors are talking about surgery on my left knee and left heel. My depressive symptoms ha[ve] increased drastically." Tr. 296. Plaintiff also noted a new condition as of May 2020 of major depression disorder-recurrent. *Id.* Plaintiff indicated a decrease in her daily activities because she has "been in severe pain and unable to move around much." Tr. 301. In the Remarks section of the report Plaintiff noted:

> I have the following medical and mental health diagnosis: Depression Anxiety PTSD Migraines sensorimotor polyneuropathy Pseudobulbar affect (PBA) bulging disc in spine Degenerative joint disease spinal stenosis High Blood pressure Abnormal EKG Hypertension heart palpitations Asthma Cataracts in both eyes[.]

Tr. 302.

    C.    The Administrative Proceedings

---

[3] Although Plaintiff lists "PDA" as a medical condition, based on her hearing testimony in the first administrative hearing this is a scrivener's error and the condition should be "PBA." Tr. 39. "Pseudobulbar affect (PBA) is a condition that's characterized by episodes of sudden uncontrollable and inappropriate laughing or crying. Pseudobulbar affect typically occurs in people with certain neurological conditions or injuries, which might affect the way the brain controls emotion." *See* https://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes/syc-20353737 (last visited Jan. 13, 2025).

Plaintiff appeared, along with her attorney, for her second administrative hearing[4] on August 15, 2023, in Columbia, South Carolina. Tr. 620. VE Brian Spillers also appeared and testified. *Id.*

### 1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff confirmed her address, testified that she is 5'3" tall, weighed 170 pounds, and graduated from high school. Tr. 625. Plaintiff stated that her first job was as a pizza delivery driver for Lots'a Cheese where she had to lift and carry 10-15 pounds. *Id.* She testified that from 2008 to 2010 she was on long-term disability and received insurance payments. *Id.* Plaintiff testified that she has constant pain in her neck and back from three herniated discs in her neck, a herniated disc in her thoracic spine, and a pinched nerve at S1. Tr. 626. Plaintiff confirmed that she had a cane and she used it mostly for balance. *Id.* Plaintiff indicated that she has problems walking and she will "trip and fall a lot." *Id.* Plaintiff stated that she has a pinched nerve in her right ankle so her "foot doesn't pick up completely." *Id.* Plaintiff confirmed that the pain from her neck radiates into her arms and affects her ability to use her arms. *Id.* Plaintiff testified that, at times, she is unable to lift her right arm completely, and she has a "burning/tingling sensation that goes down [her] arms, into [her] fingers. At times, it goes down into [her] legs and all, also." Tr. 626-27. Plaintiff confirmed that it affects her ability to use her hands and she drops things, her hands will "spasm up, and [she has] to really pry [her] fingers back open." Tr. 627. Plaintiff confirmed that the pain radiates into both her legs. *Id.* She stated that she has trouble lifting or raising both arms over her head, but more on the right than left. *Id.* Plaintiff testified that she has constant anxiety and daily mood swings. *Id.* She stated that she does not leave her house very often, does not like being in large crowds of people, does not like going to the

---

[4] The transcript from the first administrative hearing on February 16, 2021, is available in the record at Tr. 30-58.

grocery store, and she has constant flashbacks of losing her husband and her brother. *Id.* Plaintiff confirmed that she is getting therapy and sees a counselor every two weeks and a mental health doctor every two months. Tr. 628. Plaintiff testified that the therapy "helps" but she does not know "if there is any getting better." *Id.* Plaintiff testified that she does not think she could work again because she has a hard time controlling her anger. *Id.* When asked what she does during the day, Plaintiff responded that she tries to maintain what housework she can, she watches TV or has it on in the background for distraction, and she "basically just wake[s] up and get[s] through the day." *Id.* Plaintiff testified that she stopped working at Lots'a Cheese because her mental health counselor recommended that she take medical leave because of her mood swings and physical condition. *Id.*

Plaintiff indicated that she has side effects from her medication. She stated that she is constantly tired, and her pain medication makes her nauseous. Tr. 629. Plaintiff testified that she can dress herself, but that she does not bathe as often as she should because she has "a fear of falling in the shower, and sometimes, with the depression, it's just hard to make [herself] get up and go get in there." *Id.* Plaintiff stated that she makes her lunch which is "usually a sandwich or a microwave dinner." *Id.* She said that she has a friend that comes over to help clean, but Plaintiff will "pick up little things." *Id.* Plaintiff stated that she does not cook and "most everything is out of the microwave." Tr. 630. Plaintiff stated that she drives, but she has problems driving due to panic attacks. *Id.* She said she tries not to go shopping unless she absolutely has to have groceries and her son cannot go for her. *Id.* She stated that she can sit in an upright chair for about 30 minutes, and she can stand and walk for about 20-30 minutes. *Id.* Plaintiff stated that she can lift about a gallon of milk. *Id.*

In response to questions from her attorney, Plaintiff confirmed that she is depressed, and she has crying spells. Tr. 631. Plaintiff confirmed that she has panic attacks that can happen daily,

and she has them even when she is alone at home. *Id.* Plaintiff confirmed that she has been diagnosed with PTSD and has flashbacks and nightmares. Tr. 631-32. Plaintiff confirmed that she is awakened by the nightmares, and on average she gets about five hours of sleep a night. Tr. 632. Plaintiff testified that she still has headaches, and it is "not uncommon to have one daily, but [she] [has] a migraine about once a week." *Id.* Plaintiff confirmed that with a migraine headache she gets nauseous, and she has to go in a dark room without noise. *Id.* She stated the migraines "can last anywhere from 30 minutes to a couple hours." *Id.* Plaintiff further stated that she has "actually had a headache right now for about the last two weeks that [she] [hasn't] been able to get to completely go away." *Id.* Plaintiff testified that she has been on Emgality and Ubrelvy for her migraine headaches since 2019. Tr. 633. Plaintiff's counsel noted that a gallon of milk weighs about eight pounds. Plaintiff indicated that she would not be able to lift that consistently. *Id.* She testified that can "lift it a couple times a day to, you know, fix my drink, but whenever I do, my hands shake, trying to lift it." *Id.* Plaintiff testified that her son now lives with her and he "had to move back in" because he is taking care of her financially and she could not continue living alone. Tr. 633-34.

> 2.    VE's Testimony

VE Brian Spillers testified at Plaintiff's administrative hearing. Tr. 634. He described Plaintiff's past work as delivery route driver, Dictionary of Occupational Titles ("DOT") number 292.353-010, light, performed at SVP of 3, semi-skilled, generally performed at the medium exertional level but actually performed by Plaintiff at the light exertional level. Tr. 635.

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and PRW with the following residual functional capacity:

> She can lift and carry ten pounds occasionally; less than ten pounds frequently. She can sit for  six hours in an eight-hour shift. She can stand for two hours and walk for two hours. She can frequently reach overhead bilaterally. She can

frequently handle and finger objects bilaterally. She can occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She must use a handheld assistive device for all ambulation, and can use the other arm to lift and carry up to the exertional limits. She would be limited to simple, routine tasks; limited to making simple, work-related decisions; and limited to environments in which there are only routine changes in the work settings and duties. She could have occasional interaction with supervisors and co-workers, and no interaction with the general public. She would need to be off task 5% of the workday in addition to regularly scheduled breaks.

Tr. 636. The ALJ asked if an individual with these limitations could perform Plaintiff's PRW and the VE responded in the negative. *Id.* The VE testified that there would be other jobs that existed in the national economy that the individual could perform and identified the following positions: document preparer, DOT number 249.587-018, SVP of 2, unskilled, sedentary, with 35,000 jobs in the national economy; printed circuit board screener, DOT number 426.684-110, SVP of 2, unskilled, sedentary, with 25,000 jobs in the national economy; and final assembler, DOT number 713.687-018, SVP of 2, unskilled, sedentary, with 19,000 jobs in the national economy. Tr. 636-37.

The ALJ's second hypothetical included the same capabilities as in the first hypothetical with the only change being an increase in the off-task time from 5% to 20%. Tr. 637. The VE testified there would not be any jobs the individual could perform in the national economy. *Id.* He explained that while employers have some tolerance for off-task behavior, in his experience "at 10% of the workday, that would preclude full-time employment." *Id.* The VE stated that his testimony was in accordance with the DOT, and further explained:

> [T]he consideration for the off-task behavior, also the co-worker/ supervisor/general public interaction, also the direction of reaching, which was the overhead reaching, standing also, the use of the handheld device for ambulation, all that's based on my professional experience and training, Your Honor. It doesn't conflict with the DOT or the companion publications. There's no specific guidance given in those areas.

Tr. 637-38.

Plaintiff's counsel asked if the positions identified would be affected if the individual was unable to reach bilaterally. Tr. 638. The VE responded that they would, and the jobs would not be available. *Id.* The VE also testified that the jobs would not be available if the individual was unable to finger bilaterally. *Id.* In response to counsel's question regarding absenteeism, the VE testified that the jobs would be eliminated if that individual is going to be absent more than one day per month. *Id.*

With nothing further, the hearing closed. Tr. 640.

## II.  Discussion

### A.    The ALJ's Findings

In his October 26, 2023 Decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.    The claimant has not engaged in substantial gainful activity since December 11, 2019, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, neuropathy, knee degenerative joint disease, migraines, depressive disorder, anxiety disorder, personality disorder, and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift and carry 10 pounds occasionally and less than 10 pounds frequently; can sit for six hours in an eight-hour shift, can stand for two hours, and walk for two hours; can frequently reach overhead bilaterally; can frequently handle and finger objects bilaterally; occasionally climb ramps or stairs; can occasionally climb ladders, ropes, or scaffolds; occasionally balance, stoop,

kneel, crouch, and crawl; must use a handheld assistive device for all ambulation and can use the other arm to lift and carry up to the exertional limits; limited to simple, routine tasks; limited to making simple work-related decisions; limited to environments in which there are only routine changes in the work setting and duties; can have occasional interaction with supervisors and co-workers, and no interaction with the general public; and will need to be off-task 5 percent of the workday in addition to regularly-scheduled breaks.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on December 27, 1975 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 11, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 597, 600, 603, 610-11.

B. Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

11

846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff argues (1) the ALJ did not explain his findings regarding her residual functional capacity ("RFC") as required by SSR 96-8p, and (2) the ALJ failed to properly assess medical source opinion evidence. Pl.'s Br. 18, 32; ECF No. 13. The Commissioner contends that substantial evidence supports the RFC and the ALJ's evaluation of the medical opinions comported with the law and is supported by substantial evidence. Def.'s Br. 12, 23; ECF No. 16.

1.     The ALJ's RFC Determination

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible

for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c); § 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4); § 416.945(a)(3)-(4).

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulations include physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(b)-(d); § 416.945(b)-(d).

Here, at Step Two of the sequential evaluation process, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease, neuropathy, knee degenerative joint disease, migraines, depressive disorder, anxiety disorder, personality disorder and posttraumatic stress disorder. Tr. 597. Further, the ALJ found Plaintiff has the following non-severe impairments: obesity, minor vision impairment post-cataract surgery, hypertension, paresthesia (treated with no ongoing complications), mild sleep apnea, tinnitus, restless leg syndrome, and irritable bowel syndrome with occasional diarrhea, history of asthma, and PBA. Tr. 598-99. At Step Three the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals the severity of a listed impairment. Tr. 600.

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 CFR § 404.1567(a) and § 416.967(a) with several physical and mental limitations. Tr. 603. The ALJ noted that in making his RFC assessment he "considered all symptoms and the extent to which

these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." *Id.* The ALJ also indicated that he considered the opinion evidence and prior administrative findings in accordance with the regulations. *Id.*

Plaintiff asserts that the ALJ did not explain his RFC findings as required by SSR 96–8p which provides:

> In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Pl.'s Br. 18-19 (quoting SSR 96-8p, 1996 WL 374184, at *7). The court notes, though, that ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole).

Plaintiff argues that the ALJ did not consider all of her physical and mental impairments on a function-by-function basis to determine how they affect her ability to work as required by

SSR 96-8p and as set forth in *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019) (finding that a proper RFC analysis has three components: evidence, logical explanation, and conclusion). Pl.'s Br. 20. Plaintiff contends the ALJ failed to properly consider her cane use; her mental impairments; and the combination of her sleep apnea, obesity, insomnia, and PTSD.

a. Plaintiff's Cane Use

Plaintiff argues that the ALJ did not properly evaluate her use of a cane. Pl.'s Br. 20. Plaintiff argues that the ALJ's decision fails to explain how he determined that Plaintiff only needed a cane for ambulation when Plaintiff also testified that she needed it for balance and there was evidence documenting she had balance problems or unsteadiness. *Id.* at 21-22. Plaintiff argues "it would be impossible for [her] to perform frequent bilateral handling and fingering if she needed a cane for balance while standing[.]" Pl.'s Br. 21. The Commissioner argues that the ALJ properly assessed Plaintiff's need for a cane, and because sedentary work requires only occasional walking and standing, there would not be any frequent handling or fingering while standing. Def.'s Br. 13.

In his decision the ALJ noted Plaintiff's testimony from the August 2023 hearing that she "uses a cane mostly for balance, and she has problems walking and falls a lot." Tr. 604. The ALJ cited to examinations that noted "normal gait, normal stance, normal swing phase with no antalgic component, normal lumbar and thoracic range of motion, normal upper and lower extremity range of motion, normal coordination in the upper and [lower] extremities, 5/5 motor strength in both upper and lower extremities, and normal sensory and normal deep tendon reflexes in the lower extremities."[6] Tr. 605. The ALJ noted MRIs from September 2021 of Plaintiff's knees that showed

---

[6] The ALJ cited to Exhibits B-5F/3, 21 (Aug. 30, 2019, and Jan. 20, 2020 notes from Midlands Neurology & Pain Associates at Tr. 416 and 433); B-9F/7, 17 (June 8, 2020, and Aug. 3, 2020 notes from Midlands Neurology & Pain Associates at Tr. 486 and 496); B-14F/18, 23 (Mar. 16, 2020, and Apr. 13, 2020 notes from Midlands Neurology & Pain Associates, Tr. 534 and 539); and B-15F/5 (Feb. 1, 2021 notes from Midlands Neurology & Pain Associates, Tr. 562).

cysts, mild edema, and moderate effusion, but were otherwise normal; and a May 2023 record from Plaintiff's family practitioner where "it was specifically noted that the claimant's gait was normal (Exhibit B-27F/5)." Tr. 606. The ALJ noted that at two of Plaintiff's mental health visits in December 2022 and August 2023, the nurse practitioner noted that Plaintiff ambulated with a cane. Tr. 608. The ALJ stated that although diagnostic studies were consistent with disc disease and knee degenerative joint disease, Plaintiff's examinations typically noted "stable, normal gait[.]" *Id.* In limiting Plaintiff to sedentary work, the ALJ concluded that the "residual functional capacity further accounts for her degenerative disc disease, knee degenerative joint disease, neuropathy, and migraines with some additional postural and environmental limitations. While not fully supported by the record, the undersigned has also allowed for use of a cane as testified to by the claimant." Tr. 609.

SSR 96–9p explains the policies regarding the capability of a claimant to do other work when the claimant has an RFC for less than the full range of sedentary work. Regarding exertional limitations, the Ruling provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, at *7. The Ruling goes on to note that "an individual who must use a hand-held assistive device to aid in walking or standing because of an impairment that affects one lower extremity (e.g., an unstable knee) . . . who is limited to sedentary work because of the impairment affecting the lower extremity," like Plaintiff, and "who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that

exists in significant numbers." *Id.* The Ruling notes that in these situations it may be useful to consult a VE. *Id.*

Here, Plaintiff offers no medical documentation in the relevant period regarding her need for a cane. The ALJ acknowledged her testimony at the February 2021 hearing that she was prescribed a cane in December 2020, and her testimony at the August 2023 hearing that she used a cane mostly for balance. Tr. 603-604. Despite this observation, he still found Plaintiff capable of working at the sedentary level. The ALJ cited to this evidence in his decision and considered it in making his RFC determination. The ALJ also questioned the VE at the administrative hearing about the use of a cane for sedentary work. Tr. 636. The undersigned recommends finding that the ALJ properly considered Plaintiff's use of a cane in formulating his RFC assessment finding Plaintiff capable of performing sedentary work. Furthermore, as contemplated by SSR 96-9p, he consulted a VE to determine the effects of cane use on the occupational base.

### b. Plaintiff's Mental Impairments

Plaintiff argues that the ALJ did not properly evaluate her mental impairments. Pl.'s Br. 23. Plaintiff contends that there is evidence that "supports greater than moderate limitations in the B criteria findings" and greater restrictions in the RFC findings. *Id.* at 28. The Commissioner asserts that substantial evidence supports the ALJ's evaluation of Plaintiff's mental impairments. Def.'s Br. 17. The Commissioner contends that Plaintiff "cherry picks the evidence to support her preferred outcome and ignores the longitudinal picture of Plaintiff's mental functioning during the relevant period (December 11, 2019 through October 26, 2023)." *Id.* at 18.

The ALJ determined that Plaintiff has the severe mental impairments of depressive disorder, anxiety disorder, personality disorder, and PTSD. Tr. 597. At Step Three of the sequential evaluation the ALJ evaluated Plaintiff's mental impairments pursuant to Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders),

12.08 (personality and impulse-control disorders) and 12.15 (trauma- and stressor-related disorders) and determined Plaintiff did not satisfy the B criteria of these listings. Tr. 601-02.

The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* § 404.1520a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C. The ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." *Id.* § 404.1520a(c)(2); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C–H. The ratings for the functional areas consist of a five-point scale: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). SSR 96-8p provides that in assessing a claimant's mental RFC the ALJ should consider "[w]ork-related mental activities generally required by competitive, remunerative work [which] include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." 1996 WL 374184, at *6.

As required by the regulations, the ALJ documented application of the special technique to determine whether Paragraph B criteria were satisfied. Tr. 602. The ALJ determined Plaintiff had a moderate limitation in each of the four criteria. Plaintiff asserts the ALJ's analysis of her ability to interact with others; maintain concentration, persistence, or pace; and adapt or manage herself is insufficient. Pl.'s Br. 23-28. The Commissioner argues that the evidence does not support that Plaintiff had greater than moderate limitations in these areas, and no mental health provider opined that Plaintiff had limitations greater than those in the ALJ's RFC assessment. Def.'s Br. 18, 20. Plaintiff cited to several records that she argues supports greater limitations. *See* Pl.'s Br. 25. While these records reflect Plaintiff's self-reported symptoms, the records also reflect that upon examination Plaintiff's mental health symptoms were described routinely as having intact associations, intact memory, intact attention/concentration, good judgment and insight, and intact impulse control. *See, e.g.,* Tr. 1292-93. At Step Three the ALJ succinctly outlined his reasons for the Paragraph B findings and explained why he determined Plaintiff had moderate limitations in those areas. Tr. 602. Additionally, throughout his RFC analysis he also considered and explained his reasoning regarding Plaintiff's mental health issues. The ALJ considered Plaintiff's hearing testimony from 2021 and 2023 regarding her mental health diagnoses and symptoms, and her reports of outdoor activities,[7] and he outlined the objective medical evidence from 2018 through 2023. Tr. 606-08. For example, the ALJ noted:

> At a telehealth visit in February 2021, the claimant talked about feeling happy that she is going to be grandmother, and reported that generally she is doing fairly well. Other than anxious mood, the mental status examination was normal. The claimant had a cooperative attitude, calm behavior, normal speech, logical/goal-directed thought process, intact recent and remote memory, intact attention and concentration, good insight and judgment, and average fund of knowledge. She was diagnosed with bipolar disorder and PTSD. The claimant's dosage of Xanax was reduced from one tablet three times a day to one tablet

---

[7] In 2019 Plaintiff reported going camping the mountains with her son, and in 2020 she reported that she "had been going fishing with her neighbor." Tr. 607.

twice a day. Her prescriptions for Latuda and Amitriptyline were refilled (Exhibit B-33F/2-3). At a telehealth visit in May 2021, the claimant reported being off her medications for a while and not doing well due to chaos in her home. She indicated she is now gradually back to taking her medications. The mental status examination was mostly normal with a depressed and anxious mood, and fair insight and judgment, but with a cooperative attitude, calm behavior, normal speech, logical/goal-directed thought process, full orientation, intact recent and remote memory, and intact concentration and attention (Exhibit B-33F/4-5). . . . Even with reported symptoms, the mental status examination showed limited abnormal findings including an anxious and tearful affect, and fair judgment and insight, but was otherwise normal (Exhibit B-33F/6-7). At other mental health visits through August 2023, even when the claimant reported significant symptoms, mental status examinations typically remained stable with limited abnormal findings including a depressed and/or anxious affect, and at times a guarded or irritable attitude/behavior. Poor insight and judgment were noted at times as well. The claimant continued to have logical/goal-directed thought process, normal alertness, full orientation, intact recent and remote memory, and intact attention and concentration (Exhibit B-33F/9-48).

Tr. 607-08. The ALJ also considered the opinions of the State agency psychological consultants and found them to be generally persuasive; but, based on the overall record, the ALJ found Plaintiff was slightly more limited and her RFC required additional restrictions. Tr. 608-09. In concluding his discussion of Plaintiff's RFC, the ALJ noted:

Mentally, she has severe but less-than-disabling depressive disorder, anxiety disorder, personality disorder, and PTSD. The residual functional capacity restrictions of limited to simple, routine tasks; limited to simple work-related decisions; limited to environments in which there are only routine changes in the work setting and duties; and can have occasional interaction with supervisors and co-workers, and no interaction with the general public account for the claimant's mental impairments and symptoms. These mental restrictions also consider the claimant's allegations including pain, migraines, fatigue, and medication side effects, which could affect her in areas including concentration, persistence, and/or pace; tolerance for working with other people; and changes in a work setting and duties. The undersigned has further found the claimant will need to be off-task 5 percent of the workday in addition to regularly-scheduled breaks, which accounts for both physical and mental symptoms. Thus, the residual functioning capacity is consistent with the diagnostic and clinical findings of record, and adequately addresses the location, duration, frequency, and intensity of the claimant's symptoms and precipitating and aggravating factors.

Tr. 609-10.

"[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d at 1166 (citing *Sitar v. Schweiker,* 671 F.2d 19, 20–21 (1st Cir. 1982)). An ALJ must "build an accurate and logical bridge from the evidence to his conclusion[.]" *Brown v. Comm'r Soc. Sec. Admin*., 873 F.3d 251, 269 (4th Cir. 2017) (citing *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). The ALJ's factual findings on whether an applicant is entitled to benefits "are 'conclusive' in judicial review of the benefits decision so long as they are supported by 'substantial evidence.'" *Shinaberry v. Saul*, 952 F.3d 113, 120 (4th Cir. 2020) (quoting *Biestek v. Berryhill*, 587 U.S. 97 (2019)). " Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. at 102.

Here the ALJ considered the evidence in making his mental functional assessment and built an accurate and logical bridge from the evidence to his conclusion. The ALJ performed the special technique for assessing the severity of a claimant's mental impairments and adequately documented his evaluation of Plaintiff's mental impairments to support his conclusions in each functional area. The ALJ explained how his RFC assessment accounts for all of Plaintiff's impairments, both mental and physical. Upon review of the record, the undersigned recommends a finding that the ALJ properly assessed Plaintiff's mental RFC and his conclusion is supported by substantial evidence.

c. The ALJ's Consideration of Plaintiff's Impairments in Combination

Plaintiff argues "the ALJ failed to consider the combined effects of obesity, obstructive sleep apnea, and post-traumatic stress disorder when determining [she] could perform the demands of full-time, competitive work." Pl.'s Br. 29. Plaintiff argues that the "ALJ not only failed to consider obesity in combination with other impairments, he also failed to consider how multiple

impairments resulted in fatigue." *Id.* at 30. The Commissioner contends that the ALJ's decision demonstrates that he considered Plaintiff's fatigue resulting from the combination of her impairments. Def.'s Br. 22. The Commissioner asserts that "[c]ontrary to Plaintiff's argument, the ALJ properly evaluated Plaintiff's PTSD, alleged sleeping and breathing problems, and obesity." *Id.* at 23.

In evaluating a claim for disability, an ALJ is required to consider the combined effects of a claimant's impairments, and he must adequately explain his evaluation of the combined effects of those impairments. *See Walker v. Bowen*, 889 F.2d 47, 49-50 (4th Cir. 1989); *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(B) (2020), and a general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence, *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987). In this regard, it has been held that a reviewing court is entitled take an ALJ's statements regarding his consideration of a combination of impairments as true unless circumstances exist that call such statements into doubt, and that an ALJ's discussion of the various steps of his analysis does not have to be made under a particular heading in the decision. *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (taking the ALJ at his word when he stated that he considered all of the claimant's impairments in combination); *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001) (discussion and evaluation of evidence for a particular step of analysis does not have to be under a certain heading; decision as a whole is considered).

At Step Two the ALJ determined Plaintiff's severe impairments included PTSD, and her non-severe impairments included obesity and sleep apnea. Tr. 597, 599. The ALJ noted that the medical record contains diagnoses of obesity, but also that "recently, in June 2023, the claimant's

BMI was 29.76[8] (Exhibit B-28F/9). There is no evidence that the claimant's obesity causes or contributes to any work-related limitations." Tr. 597. The ALJ noted that Plaintiff "has a history of mild sleep apnea (2007) (Exhibit B-5F/2)." Tr. 599. The ALJ stated that Plaintiff underwent a sleep study in June 2023 with the following results:

> Dr. Bogan indicated the sleep study showed evidence of obstructive sleep apnea. He indicated it is difficult to determine if her degree of obstructive apnea is contributing to the nonrestorative sleep and fatigue based on polypharmacy and comorbidities. He indicated the claimant would be given a trial of CPAP. The mental exam was normal and the claimant specifically denied depression. The physical exam was also normal. Smoking cessation was discussed (Exhibit B-29F/2-5).

*Id.* The ALJ found that the "medical evidence does not show any work-related limitations associated with sleep apnea." *Id.* The ALJ stated that to determine Plaintiff's RFC he "considered the functional limitations resulting from *all* of the claimant's medically determinable impairments, *including the nonsevere impairments* (20 CFR 404.1545 and 416.945)." Tr. 600 (emphasis added). The ALJ determined that the evidence did not support "any additional functional limitations other than those included in [the RFC assessment]." *Id.* Within his discussion of Plaintiff's RFC the ALJ included references to Plaintiff's testimony regarding PTSD and flashbacks, and her nightmares. Tr. 603-04. He also discussed Plaintiff's reported statements to medical providers regarding her symptoms, including a February 2021 report to a neurologist that she had "no trouble sleeping and no ER visits (Exhibit B-15F/4-5)[,]" Tr. 606, and an August 2021 report to her mental health provider that she was experiencing "withdrawal effects and feeling extremely fatigued with racing thoughts and struggling to get anything accomplished after her medical provider took her off Adipex 'cold turkey[,]'" Tr. 607-08. In finding that the "overall evidence of record" supported his

---

[8] An adult with a BMI range of 30 or greater is considered obese. A BMI of 25 to less than 30 is considered overweight. *See* https://www.cdc.gov/bmi/adult-calculator/bmi-categories.html (last visited Jan. 8, 2025).

RFC assessment, the ALJ noted that his mental restrictions considered Plaintiff's "severe but less-than-disabling depressive disorder, anxiety disorder, personality disorder, and PTSD." Tr. 609. He further added that the mental restrictions also considered Plaintiff's allegations "including pain, migraines, *fatigue*, and medication side effects, which could affect her in areas including concentration, persistence, and /or pace; tolerance for working with other people; and changes in a work setting and duties." *Id.* (emphasis added).

The ALJ's narrative regarding Plaintiff's RFC is sufficiently detailed and explanatory to show that he considered the issue as to whether Plaintiff's impairments in combination were disabling. Accordingly, the undersigned recommends a finding that the ALJ did not err in his consideration of Plaintiff's impairments.

## 2.    ALJ's Evaluation of Medical Source Opinion Evidence

In her final argument Plaintiff asserts that the ALJ's analysis of the opinions of Ms. Dashio was insufficient. Pl.'s Br. 34. The Commissioner argues that the ALJ properly considered Ms. Dashio's opinions in compliance with the revised regulations, and further notes that "there is no evidence to support that Ms. Dashio treated Plaintiff, had any contact with Plaintiff, or had any training, knowledge, and/or qualifications to render an opinion about Plaintiff's mental abilities." Def.'s Br. 23.

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s), including those from [a claimant's] medical sources").[9] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3).

### a. Ms. Dashio's Opinions

The record contains two "Medical Opinion[s] Re: Ability to Do Work-Related Activities (Mental)" questionnaires completed by Ms. Dashio. Tr. 514-15, 1281-82.[10] Section I of the first form, completed on January 11, 2021, provides opinions regarding Plaintiff's mental abilities and aptitudes to do unskilled work. This section indicates Plaintiff has "limited but satisfactory" ability to ask simple questions or request assistance; and "seriously limited, but not precluded" ability to

---

[9] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5).

[10] The questionnaires were sent to Kershaw Mental Health/Kershaw County Mental Health. Tr. 514, 1281.

understand and remember very short and simple instructions, carry out very short and simple instructions, work in coordination with or proximity to others without being unduly distracted, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and be aware of normal hazards and take appropriate precautions. Tr. 514. Section I indicates Plaintiff is "unable to meet competitive standards" in the ability to remember work-like procedures, maintain attention for a two-hour segment, sustain an ordinary routine without special supervision, make simple work-related decisions, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in a routine work setting, or deal with normal work stress. *Id.* Section I further indicates Plaintiff has "no useful ability to function" to maintain regular attendance and be punctual within customary usually strict tolerances or complete a normal workday and workweek without interruptions from psychologically based symptoms. *Id.*

Section II provides opinions regarding Plaintiff's mental abilities and aptitudes to do semi-skilled and skilled work. Tr. 515. The form indicated Plaintiff is "seriously limited, but not precluded" from setting realistic goals or making plans independently of others; she is "unable to meet competitive standards" for understanding and remembering detailed instructions or carrying out detailed instructions; and she has "no useful ability to function" to deal with the stress of semi-skilled and skilled work. *Id.*

Section III provides opinions regarding Plaintiff's mental abilities and aptitudes needed to do particular types of jobs. Tr. 515. The form indicates Plaintiff is "seriously limited but not precluded" from adhering to basic standards of neatness and cleanliness, she is "unable to meet competitive standards" to interact appropriately with the general public and maintain socially appropriate behavior; and she has "no useful ability to function" to travel in an unfamiliar place or use public transportation. *Id.*

Section IV of the questionnaire asked for any additional reasons why the patient would have difficulty working at a regular job on a sustained basis; however, no further explanation was provided. Tr. 515. Section V asked how often the patient's impairments or treatment would, on average, cause them to be absent from work, and Ms. Dashio indicated "more than four days per month." *Id.* Section VI asked if the patient could manage benefits in her own best interest, and Ms. Dashio indicated "yes." *Id.*

The second opinion of Ms. Dashio, completed on August 10, 2023,[11] is the same questionnaire. In Section I of this form regarding Plaintiff's ability to do unskilled work, Ms. Dashio indicated Plaintiff had "limited but satisfactory" ability to carry out very short and simple instructions and be aware of normal hazards and take appropriate precautions, and she was "seriously limited but not precluded" from understanding and remembering very short and simple instructions or asking simple questions or requesting assistance. Tr. 1281. The form indicates Plaintiff was "unable to meet competitive standards" in her ability remember work-like procedures, maintain regular attendance and be punctual within customary usually strict tolerances, make simple work-related decisions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, or deal with normal work stress. *Id.* Ms. Dashio indicated Plaintiff would have "no useful ability to function" to maintain attention for a two-hour segment, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being unduly distracted, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an

---

[11] The form is dated "8-10-24." Tr. 1282. However, as noted by the ALJ, this must be a scrivener's error as August 2024 had not yet occurred, and the fax cover sheet had a date of "8-10-23." Tr. 609.

unreasonable number and length of rest periods, or respond appropriately to changes in a routine work setting. *Id.*

In Section II of the form related to ability to do semi-skilled or skilled work, the only change from the prior opinion was that Plaintiff had "no useful ability to function" in the area of understanding or remembering detailed instructions. Tr. 1282. In Section III, Ms. Dashio indicated that Plaintiff was now "seriously limited but not precluded" from maintaining socially appropriate behavior, and she now had "no useful ability to function" to adhere to basic standards of neatness and cleanliness. *Id.* Ms. Dashio's responses in Sections IV, V, and VI remained the same as in the 2021 questionnaire. *Id.*

b. The ALJ's Consideration of the Opinions

The ALJ evaluated the two opinions of Ms. Dashio from January 2021 and August 2023 and found them unpersuasive. Tr. 609. The ALJ noted:

> While the claimant's representative's brief indicates Ms. Dashio is a treating provider (Exhibits B-13E/3 and B-20E/3), the record does not contain any mental health records from Ms. Dashio, nor do these opinions provide any indication of this professional's mental health training. Further, Ms. Dashio's opinions consist of a series of checked boxes on these forms, without further explanation or supporting evidence. Mental health treatment notes do not show mental status examination findings that would support such extreme limitations as set forth on these forms.

*Id.*

c. Discussion

When discussing the finding about the persuasiveness of an opinion, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ's discussion of Ms. Dashio's opinions indicates that he found they lacked supportability because "the record does not contain any mental health records" from the author of the opinion, nor is there any information regarding the author's mental health training. Tr. 609. Additionally, the ALJ noted that there was no explanation or

28

supporting evidence provided for the "series of checked boxes on these forms[.]" *Id.* Checkbox forms lacking explanation are considered weak evidence. *See Roof v. Saul*, No. CV 5:19-1571-MGL-KDW, 2020 WL 3549206, at *11 (D.S.C. June 23, 2020), *adopted*, 2020 WL 3548814 (D.S.C. June 30, 2020) (collecting cases). The ALJ also found the opinion inconsistent with other mental health treatment notes which "do not show mental status examination findings that would support such extreme limitations as set forth on these forms." *Id.* Before weighing the available medical-source opinions, the ALJ set out an accurate and fairly thorough summary of treatment and examination notes from the relevant period, including mental health records from the same period as Ms. Dashio's opinions. Tr. 607-08. As discussed earlier in this Report, while these records supported Plaintiff's mental health diagnoses, the examinations showed limited abnormal findings. *Id.* The ALJ also considered the June 2020 and September 2020 opinions of the State agency psychologists contained in the Mental Residual Functional Capacity Assessments. Tr. 608 (citing Exhibits B-4A, B-5A, B-8A, and B-9A). The ALJ noted their conclusions that Plaintiff "is able to understand and remember both simple and detailed instructions; is able to attend to and perform simple, unskilled tasks; is able to respond appropriately to supervision, coworkers and the public; and is able to be aware of normal hazards and take appropriate precautions, use judgment to make simple work-related decisions, and respond appropriately to changes in a routine work setting." *Id.* The ALJ determined these conclusions were "generally persuasive and supported by the State agency psychological consultants' rationale and are consistent with the overall record," but still found Plaintiff was slightly more limited and adjusted his RFC assessment accordingly. Tr. 608-09.

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The issue is whether the ALJ's decision is supported by substantial evidence, not whether a different conclusion could be

supportable. "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (per curiam) (unpublished) (internal citation & quotation omitted. In undertaking review of the ALJ's treatment of a claimant's medical sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence. As required by the regulations, the ALJ considered the persuasiveness of the opinions contained in Ms. Dashio's medical opinions applying the factors of supportability and consistency. 20 C.F.R. §§ 404.1520c(b)-(c), 416.920c(b)-(c). Under the new regulations for consideration of opinion evidence, the medical source's treating relationship with the claimant should be taken into consideration regarding the persuasiveness of the opinion. *See* 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3). Here, there is no indication that Ms. Dashio had a treating relationship with Plaintiff, or the level of her expertise in mental health. Therefore, in reviewing the decision and paying particular attention to the ALJ's discussion of Plaintiff's moderate mental limitations, the ALJ provided sufficient reasoning for his findings.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned cannot determine that the Commissioner's finding was unsupported by substantial evidence or reached through application of an incorrect legal standard.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

January 24, 2025                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**